IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BEVERLY BEREN, BERNADETTE SEPRISH, | ) | |
| PAHOUA LEE, AMY SORIANO, | ) | |
| ANNE ROBINSON, SITA MONTI, | ) | |
| JEAN REEVE, HARRIET PATTERSON, and | ) | |
| ANDREA DUDA | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | No. 07-05450 |
| | ) | |
| Plaintiffs, | ) | Judge James B. Zagel |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Demanded |
| RAYMOND JAMES FINANCIAL, INC. AND | ) | |
| ALL RELATED SUBSIDIARIES, INCLUDING | ) | |
| RAYMOND JAMES AND ASSOCIATES; | ) | |
| RAYMOND JAMES FINANCIAL | ) | |
| SERVICES, INC.; AND EAGLE ASSET | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiffs Beverly Beren, Bernadette Seprish, Pahoua Lee, Amy Soriano, Anne Robinson,

Sita Monti, Jean Reeve, Harriet Patterson and Andrea Duda (collectively "Plaintiffs"), on behalf

of themselves and all others similarly situated, by and through their attorneys, Stowell &

Friedman, Ltd., hereby file this Amended Complaint of gender discrimination against

Defendants Raymond James Financial, Inc., Raymond James and Associates, Raymond James

Financial Services, Inc., Raymond James Bank, FSB, Raymond James, Ltd., and Eagle Asset

Management ("Raymond James," "Defendant," or "the Firm"), and state as follows:

## JURISDICTION

1. Jurisdiction is based on 28 U.S.C. §1331, §1343 and principles of pendent and

supplemental jurisdiction.

## **PARTIES**

2.  Plaintiffs, Beverly Beren ("Beren"), Bernadette Seprish ("Seprish"), Pahoua Lee

("Lee"), Amy Soriano ("Soriano"), Anne Robinson ("Robinson"), Sita Monti ("Monti"), Harriet

Patterson ("Patterson") and Jean Reeve ("Reeve") are former employees of Raymond James.

Plaintiffs, Anne Robinson ("Robinson") and Andrea Duda ("Duda") are current employees of

Raymond James who continue to discharge all duties assigned to them competently and have

excellent reputations with regard to the high quality of their work and with regard to their

conscientious devotion to their jobs.   During their employment, Beren, Seprish, Lee, Monti and

Soriano also discharged all duties assigned to them competently and earned excellent reputations

with regard to the high quality of their work and with regard to their conscientious devotion to

their jobs.

3.  Raymond James Financial, Inc. ("RJF") is the parent corporation of several subsidiary

companies, including but not limited to, Raymond James Financial Services, Inc. ("RJFS"),

Raymond James and Associates ("RJA") and Eagle Asset Management ("EAM").  These

wholly- owned subsidiaries of RJF, are located in St. Petersburg, Florida.  Collectively, RJF and

its related entities are referred to herein as "Raymond James."  Raymond James' organizational

structure is on its publicly available website at

http://www.raymondjamesassociates.com/company_organizational_chart.htm.  Plaintiffs allege

that the pattern and practices of gender discrimination described herein affects employees of

each of Raymond James' subsidiaries, including but not limited to those specifically named

herein, which for all practical purposes operate as one common employer.[1]

4.  Raymond James is a diversified financial services company that, through its wholly-owned subsidiaries, engages primarily in investment and financial planning, including securities and insurance brokerage, investment banking, asset management, banking and cash management, and trust services.  Through its North American investment firms, banks and other subsidiaries, including but not limited to, RJA, RJFS and EAM, Raymond James has more than 4,800 financial advisors in more than 2,200 locations throughout the United States, Canada and overseas, providing services to more than one million individual and institutional accounts with $171 billion in client assets.  Raymond James' net revenue for 2006 was $2.63 billion.[2]  At all times relevant to this Amended Complaint, Raymond James employed more than fifteen (15) employees and was engaged in an industry affecting commerce.

## FACTUAL ALLEGATIONS

### Raymond James Systemically Discriminates Against Women

5.  Raymond James has and continues to engage in a nationwide pattern or practice of discrimination against female employees.   Raymond James' unlawful conduct includes, but is

---

[1] Raymond James and Raymond James' subsidiaries, including but not limited to those mentioned herein, act as an integrated employer.  Upon information and belief, Raymond James and Raymond James' subsidiaries, including, but not limited to, those mentioned herein, share: payroll and insurance programs; services of managers and personnel; and use of office space, equipment, and storage.  Moreover, upon information and belief, the same individuals manage or supervise the different entities the entities have common officers and boards of directors. Raymond James and Raymond James' subsidiaries, including, but not limited to, those mentioned herein, also have a centralized control of labor relations where:  there is a centralized source of authority for development of personnel policy; one entity maintains personnel records; the entities share a personnel (human resources) department; inter-company transfers and promotions of personnel are common; many of the same persons make the employment decisions for the several entities.  Further, upon information and belief, Raymond James and Raymond James' subsidiaries, including, but not limited to, those mentioned herein, have many of the same persons serve as officers and/or directors of the different entities.  Finally, upon information and belief, Raymond James Financial, Inc. owns the majority or all of the shares of Raymond James' subsidiaries, including, but not limited to, those mentioned herein.

[2] Raymond James is a member of the National Association of Securities Dealers ("NASD") a/k/a FINRA ("Financial Industry Regulatory Authority") and its financial advisors primarily are independent contractors.  RJA is a member of the New York Stock Exchange ("NYSE") and its financial advisors are employees.

not limited to systemic and pervasive sexual discrimination in compensation and promotional opportunities and unequal pay practices.

6.  Notwithstanding the number of brokers Raymond James employs nationwide, its workforce is not diversified by sex or race.  Upon information and belief, far less than a representative share of Raymond James' brokers are female and less still are minorities.  Upon information and belief, although Raymond James has approximately 2,200 branch offices, female branch managers run fewer than 25% of those offices.  Indeed, the substantial majority of Raymond James' brokers and branch managers are white males.  As explained below, the composition of Raymond James' workforce is not the result of chance but is the result of intentional discrimination.

7.  Plaintiffs' denial of management opportunities/job classification class claims broadly focus on the literal terms of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(2).  Raymond James' standard operating procedure is to  "limit, segregate, or classify" employees in a manner that "would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee" because of sex.

8.  The pattern and practice of discriminatory conduct against women at Raymond James includes, but is not limited to, the following:

        a.  failing to hire women;

        b.  underutilizing women;

        c.  taking adverse actions against its women managers, such as reducing job responsibilities, demoting, transferring, constructively discharging,

reducing in force and discharging women on account of their sex and/or their rejection of or unwillingness to tolerate unwelcome sexual conduct.

  d. engaging in occupational segregation based on gender and/or gender stereotypes, including, but not limited to, hiring women primarily as sales assistants and other clerical or non-producing roles;

  e. taking sex, pregnancy, marital and/or parental status and gender stereotypes into consideration when making employment decisions such as hiring, training, promoting, transferring or assigning job responsibilities, including but not limited in the context of reorganizing departments, determining compensation and exercising managerial discretion in connection with, for example, conducting performance reviews, providing managerial support and/or providing career development opportunities;

  f. failing to credit women, for their experience on the same basis as men and failing to consider women for timely promotions or title changes on the same basis as men;

  g. systematically paying women lower wages, for example, lower overall compensation, as well as lower compensation with respect to individual components of compensation;

  h. systematically transferring or demoting women or otherwise altering the terms and conditions of their employment with the intent of adversely affecting their earnings;

i.   denying women opportunities to increase their earnings, including with respect to base pay, commissions, bonuses, stock options and other forms of commissions;

j.   negligently hiring, retaining and promoting men with known propensities to discriminate against women and sexually harassing them or treating them in a demeaning manner;

k.  making significant employment decisions based on gender and/or gender stereotypes;

l.   requiring women to meet licensing requirements and to perform the duties of higher paid positions but denying them the salary, title and authority of the positions which they performed;

m.  taking adverse actions against women, such as removal or reassignment of their customer accounts, demotions, transfers, constructive discharges and discharges on account of their sex and/or their rejection of or unwillingness to tolerate unwelcome sexual conduct;

n.  humiliating, intimidating, and demeaning women including frequently and inappropriately remarking about their sex, marital and parental status, bodies and clothing and otherwise creating a hostile and offensive work environment;

o.  penalizing women for taking leaves of absence that are FMLA-related or otherwise;

p.  defaming women to their clients, corporate partner relationship representatives and current and former coworkers, including but not limited to after women leave Raymond James; and

6

q.   retaliating against women who complain of discrimination or

harassment or who otherwise oppose Raymond James' discriminatory policies and

practices, including by subjecting them to further discrimination, retaliation, verbal

attacks, reassigning their job duties, terminating them, or constructively discharging

them.

9.   The discrimination and retaliation described above is ongoing and constitutes a

continuing violation of the civil rights laws.

**The Pattern of Discrimination and Retaliation Transcends All Aspects of Employment**

10.   Raymond James has a strong corporate culture that is biased against women and

reinforces the differential treatment of women.  This is especially true for women over the age of

40, who are often disadvantaged to the benefit of younger men.  Raymond James maintains

stereotypical views about the skills, abilities and potential of women that form the basis of

personnel decisions.  Raymond James' corporate culture creates an environment where

occupational segregation, disparate treatment, and harassment are pervasive and are condoned.

11.   Raymond James' human resources and legal departments are ineffective at resolving

complaints of gender discrimination and retaliation and, as a result, many women recognize the

futility of lodging internal complaints.  Those who do come forward suffer retaliation.

12.   Raymond James' pattern and practice of gender discrimination is demonstrated in

part by its historic and continued underrepresentation of women in high earning positions,

management positions and, particularly, senior management positions.  The dramatic

underrepresentation of women as senior managers is due to the Firm's discriminatory recruiting

and hiring practices.  Raymond James' nearly all-male management team[3] is responsible for

hiring decisions and applies higher standards to female candidates.  This same management team

controls promotions and directs women into certain jobs, rather than others.  Female employees

recognize the futility of lodging internal complaints.  Raymond James' human resources

department and legal department defend discriminators and harassers and do not take adequate

steps to prevent Raymond James from retaliating against female employees who lodge

complaints.

13.  Raymond James does not foster an environment where women feel free to complain

of discrimination or harassment.  Instead, women often feel intimidated from coming forward

and fear retaliation.

14.  As a result of the lack of opportunity for career advancement, the discriminatory

work environment, and the ineffective human resource department, female employees are denied

promotion, are forced to seek transfers to other business units and/or demoted or terminated.

Many women resigned their employment to mitigate the damage to their careers.

**Sexual Discrimination at Raymond James Is National in Scope**

15.  The problems of sexual discrimination at Raymond James are national in scope.  The

named Plaintiffs and putative class representatives worked at Raymond James in Georgia,

---

[3] According to Raymond James' website, the RJF management team consists of the following managers:  Thomas "Tom" A. James, Chairman and Chief Executive Officer; Chester "Chet" Helck ("Helck"), President and Chief Operating Officer; Richard "Dick" G. Averitt, III ("Averitt"), Chairman and Chief Executive Officer, Raymond James Financial Services; Jeffrey Julien, Senior Vice President of Finance and Chief Financial Officer; Richard Riess, Executive Vice President of Asset Management, CEO Eagle Asset Management; Van Sayler, Senior Vice President, Fixed Income Department Manager; Jeffrey Trocin, Executive Vice President, Equity Capital Markets; Dennis Zank, President, Raymond James & Associates; Thomas R. Tremaine, Executive Vice President, Operations and Administration, Raymond James & Associates; and J. Timothy "Tim" Eitel, Senior Vice President and Chief Information Officer, Raymond James Financial.

Michigan and Florida.  The class members who are relying on the class representative to protect

their rights work or worked at Raymond James offices throughout the country.

16.   Raymond James openly recognizes that women (and minorities) are

disproportionately represented in the firm's management and higher compensated positions, and

takes public steps to window dress this issue by advertising on its web site and otherwise the

existence of special programs.  For example, Thomas James, chairman and chief executive, has

allegedly given his direct reports diversity goals.   Raymond James also claims that it offers its

employees a Diversity Council and networks for women, for working parents and for gay,

lesbian, bisexual and transgender employees.  Although such diversity programs purportedly

exist to help women and minorities advance within the company, in reality these programs are

yet another obstacle for women and minorities and only serve to label them and highlight their

differences.  These programs notwithstanding, Raymond James sends a message to women and

minorities that they do not fit within its organization.  Indeed, Angela Biever, the only woman on

the Board of Directors for Raymond James has publicly stated that she is not happy with the

firm's progress regarding diversity issues.

**The Claims of the Class Representatives Demonstrate the Necessity for and
Appropriateness of Class Treatment**

17.   Although the class representatives worked in different positions, their experiences

were remarkably similar.  As stated above, occupational segregation, wage discrimination,

hostile work environment, sex based denial of opportunity, and retaliation were commonplace.

Further, Raymond James was on notice of the scope of the problem and actively participated in

the wrongdoing.

*Beverly Beren*

18.   Beren began her employment at Raymond James with a predecessor company called Investment Management & Research, Inc. ("IM&R") (also a wholly-owned subsidiary of RJF) on or about October 1991 in Atlanta, Georgia as a Business Development Administrator.

19.   During her employment with Raymond James, Beren was subjected to unlawful gender discrimination.  Consistent with Raymond James pattern and practice of gender discrimination described above, Beren was denied recognition, compensation, support and other income-generating opportunities that were provided to men over the course of her career.

20.   From the beginning of Beren's employment, Chet Helck ("Helck"), President and Chief Operating Officer of RJF, consistently undervalued her skills and responsibilities as a result of her gender, effectively treating her as a stereotypical sales assistant rather than a recruiting professional.  Throughout her career, Helck repeatedly demeaned Beren's skills and knowledge, often telling her, as he did other women, that she "did not know what she was talking about," or words to that effect.

21.   Throughout her time with Raymond James, Beren expressed interest in and formally applied for several positions of increased responsibility.  However, rather than promote Beren to positions commensurate with her experience, Raymond James consistently passed over her in favor of younger men.  In response to a request by Beren to be considered for a recruiting position that she was qualified for, Helck refused, responding that he did not want to "set [her] up to fail."  To Beren's knowledge, Helck did not hire a single female recruiter during her fifteen year tenure with Raymond James.

22.   Instead, Helck and other male supervisors after him increased Beren's responsibilities but, consistent with Raymond James' pattern and practice of gender

discrimination, Beren did not receive formal recognition or pay increases in connection with these increased responsibilities.  For example, when Beren was formally promoted to Assistant Vice President ("AVP"), her job description remained the same.  This practice occurred routinely during Beren's career at Raymond James.  In one instance, Bill McGovern ("McGovern"), Director of Business Development, announced at a department-wide meeting at Raymond James' national conference in Salt Lake City that Beren would manage the support staff.  Despite the new responsibilities, Beren did not receive a raise or a change to her job description.  Beren complained to McGovern and human resources about not receiving a raise when she became a manager.  To the best of Beren's knowledge, no action was taken.  Thus, to others evaluating Beren for potential advancement within Raymond James, it appeared as though her job duties were rarely enhanced through time, despite the fact that her responsibilities had, in fact, increased substantially.

23.  Women were rarely allowed to attend important job-enhancing training.  Beren routinely requested the opportunity to attend the Securities Industry Association ("SIA") Securities Industry Institute ("SII") at Wharton in her written performance reviews.[4]  Consistent with Raymond James' pattern and practice of gender discrimination, Helck refused to send Beren to SII and instead, continued to send younger male employees to Wharton.  In fact, Helck critiqued a female VP who allowed a female AVP to attend SII as "setting a precedent"

---

[4] The SII is an intensive, three-week program consisting of three one-week training sessions over the course of three usually consecutive years.  The training sessions take place at the Wharton School of the University of Pennsylvania and are taught by Wharton professors and other nationally-renowned speakers in the securities industry as well as experts who present topics on economics, critical thinking and diversity issues.  Attending the SII, and similar training and networking events, was key to career advancement at Raymond James.  The vast majority of individuals Raymond James sent to the institute were men.  Most of those same men become among the most senior executives at Raymond James.

detrimental to the company.  This was not the first or last time Beren's requests to go to SII were summarily dismissed.

24.  Additionally, unlike many males with whom Beren worked, Beren was not hand-picked by Raymond James' managers as a "rising star" and, therefore, was routinely denied career advancement opportunities, training and other beneficial treatment, such as, "face time," recognition at key meetings of her contributions, preferential assignments and networking opportunities that were provided to men.[5]

25.  Consistent with the above-described pattern and practice of gender discrimination, IM&R and later Raymond James went out of its way to accommodate and enhance the careers of men.  Rather than helping Beren with her own career, Helck belittled Beren with gender-biased comments, including telling Beren not to be a "victim" of divorce.  On other occasions, Helck repeatedly and publicly belittled Beren by spreading rumors to Beren's peers that Beren "did not know much about the securities industry," or words to that effect.  Men at Raymond James were not similarly exposed to such public criticism.

26.  Similarly, Beren was subjected to harsher performance standards than male employees.  Upon information and belief, Beren believes that this practice is routine at Raymond James.

27.  Throughout her employment, Beren was paid less than similarly situated men performing similar functions and/or at the same level.  Beren repeatedly saw compensation, including bonuses, manipulated to the disadvantage of women, and lost compensation as a result of such manipulation.  Likewise, Beren repeatedly saw the careers of male employees advance –

---

[5] Such opportunities were critical, as they provided additional exposure to senior managers at Raymond James, reinforcing the "rising star" status of men who received those opportunities.  By contrast to men who routinely received such recognition, however, Beren was recognized for her contributions only once or twice during her

often into the highest ranks of management – while Beren was repeatedly denied those opportunities.

28. In approximately November 2003, Beren was asked to relocate to St. Petersburg, Florida. Although she did not want to move, Beren agreed to relocate to St. Petersburg with the hope that she would finally gain the management responsibilities that she had been routinely denied. Beren later learned that this move would only assist Raymond James in terminating her.

29. As she had before she relocated to St. Petersburg, Beren continued working for men who had no qualms about objectifying women. Indeed, Bill Counsman, a First VP, made comments regarding candidates that Beren interviewed for the support staff positions that evidenced his gender animus and stereotypical views of women. For instance, Counsman noted that one internal female candidate was a "belly dancer." Additionally, a woman who had reported to Counsman suggested that Beren just hire blonde "eye candy," as it was well known that was consistent with Counsman's and McGovern's typical hiring patterns. Indeed, it was well known that McGovern looked at female employees "from the bottom up," focusing on their physical appearance and/or sexual appeal rather than their contribution to the workplace. This reputation followed McGovern from another firm, where his nickname was "Chester" because he was known for looking at women's breasts when speaking to them.

30. Unlike her male counterparts, Beren was subjected to discriminatory performance evaluations. After consistently receiving glowing performance evaluations, Beren unexpectedly received a negative performance evaluation. Beren believed that this evaluation was given to her, in part, because she was a woman. In response to the evaluation. Beren's supervisory duties were taken away from her. Thereafter, Raymond James systematically took away more

fourteen-year career at Raymond James and she was routinely denied access to key meetings where she could be

responsibilities from Beren.   Confirming what Beren had expected, that she was not going to be advanced through the Firm because she was a woman, Beren learned that Averitt asked McGovern if Beren should be "developed more."  McGovern responded "no."

31.  As a result of this treatment and Raymond James' failure to modify Beren's job description to accurately reflect her duties, Beren received both compensation and treatment lower than that of males in comparable Assistant Vice President positions.  This treatment, along with Raymond James' pattern and practice of gender discrimination, resulted in Beren hitting the "glass ceiling" that exists for women preventing them from advancing to senior management.

32.  Near the end of her career at Raymond James, the Company announced a purportedly anonymous survey of employees.  Survey participants were asked to identify their age, gender, and department.  In response to a question asking what Raymond James could do to improve the firm, Beren responded "demolish good ole' boy network," or words to that effect.

33.  Shortly after completing the survey, in approximately mid-February 2006, McGovern informed Beren that her position was eliminated and that, as a result, her employment was terminated effective approximately mid-April 2006.  Upon information and belief, younger male employees took over Beren's job responsibilities.  After being notified of her looming termination, Beren placed Raymond James on notice of her intent to pursue claims with the EEOC.

34.  Even after informing Beren of her termination, Raymond James continued to discriminate and retaliate against Beren.  For example, Beren understands that male employees received benefits, pay and accolades not provided to females terminated as a part of Raymond James' alleged reduction in force.

---

seen by other senior managers as a key contributor at the company.

*Bernadette Seprish*

35.  Seprish was hired by RJA in approximately 1983 as a marketing manger.   From the beginning of Seprish's employment at RJA and then at Robert Thomas Securities ("RTS"), a wholly-owned subsidiary of RJF, Raymond James' and Seprish's managers consistently undervalued Seprish's skills and responsibilities as a result of her gender and/or gender stereotypes.  More recently in her career, Seprish experienced age discrimination at Raymond James.

36.  Like Beren and unlike many of her male and younger counterparts, Seprish was also delayed in the opportunity to attend the Securities Industry Association ("SIA") Securities Industry Institute ("SII").  The vast majority of individuals Raymond James sent to the institute were men, with most becoming senior managers at Raymond James.  A few are now on the RJF Operating Committee.

37.  Shortly after IM&R and RTS merged, Seprish remained responsible for marketing for RTS.  Consistent with the above-described pattern and practice, however, Seprish was asked to serve in an AVP capacity during this time despite holding the title of VP, thereby reducing her visibility and perceived stature and value within the company.  As a result, although Seprish managed a direct report during this period of time, she was not widely viewed within the company as a manager.

38.  Additionally, Seprish's salary did not increase commensurate with her responsibilities in comparison to her male coworkers.  Indeed, even after her job was analyzed for a wage increase, she continued to get paid at a level significantly lower than that of her male and younger coworkers.

39.  Further, although Raymond James obviously evaluated and analyzed its salary and job structure, to Seprish's knowledge, it chose not to correct compensation and promotion disparities that existed based on gender and/or age.  Indeed, Seprish is aware of one woman over forty whose salary was cut by one third in comparison to her male counterparts.  As Seprish understands, this employee was offered another position and when asked what would happen if she did not take it, she was told she would be terminated.

40.  Even worse, Seprish, despite her years of experience, was effectively demoted after being told that she would be transferring into a position with the sales management team that had future growth opportunities within the Company.  In reality, however, Seprish's move was in the wrong direction.  In this new position Seprish reported to Scott Whitley, a First VP, and functioned in an AVP capacity despite her title of VP.  Prior to this, Seprish reported to Steve Putnam, President of RJFS Securities Division (formerly RTS).  Seprish received no new job description in connection with her transfer and actually lost career advancement and earning opportunities.

41.  Consistent with Raymond James' pattern and practice of gender discrimination, Seprish also was discriminated against with respect to her performance reviews.  Pursuant to Raymond James' policies and practices, employees were to be reviewed twice a year, once in approximately December, at which time salary increases and bonus payments were determined for exempt employees, and once in approximately June.  Despite this policy, when Seprish asked her then-manager Whitley about her review, Whitley told Seprish that reviews did not have to be conducted for VP level employees.  Whitley conducted no review and, as a result, Seprish received neither a merit nor cost of living salary increase.  Seprish believes that Raymond James evaluated male VP employees and younger VP employees during this time.

42.  Likewise, consistent with Raymond James' pattern and practice of gender discrimination, Seprish was passed over for a promotion to Sales Manager in favor of a less experienced man.  Seprish also applied for and was denied a recruiting position under McGovern.  For both positions, Seprish contends she was not hired – consistent with Raymond James' pattern and practice of gender and age discrimination – because she was an older woman.  McGovern's next two hires for recruiters were Jody Myers ("Myers") and Matt Sines ("Sines"), neither of whom had producing financial advisor backgrounds.  Both were males under forty years of age.

43.  After a lengthy executive search, a man named C. Kent Christian ("Christian") was hired from outside the Raymond James to lead the sales management team.  Christian reorganized the sales management department from a division-based team to a geographical based region consistent with the four compliance regions (Northeast, South, West and Midwest).  Christian assigned each of the three current sales managers (Scott Whitley, Tom Harrington and David Patchen) to regions and sought to hire a fourth sales manager position.  Seprish applied for this position but, despite her vast qualifications, was not hired based on her gender and/or age.  Ultimately, in late 2004, Christian hired David Sisemore, who had worked with Christian at Bank of America, despite the fact that Seprish was more qualified based on her experience and history with Raymond James.

44.  Thereafter, four male sales managers, Sisemore, Whitley, Harrington, and Patchen, were officially installed in their roles as Regional Vice Presidents ("RVPs").  Christian offered Seprish the lower ranking and less prestigious position of Director of Practice Management, which Seprish accepted.  Rather than serving as a leader under the organizational structure

envisioned by Christian, Seprish served in a consulting or support role despite her 15-plus years as a VP with Raymond James.  She continued to report to younger men.

45.  Shortly after Seprish became the Director of Practice Management, a young male employee, Matt Ransom ("Ransom"), was hired to work with Seprish.  Ransom, age 25, initially joined RJA as part of its college hiring "options candidate" program.[6]  Ransom was assigned to work with Seprish after completing his three different six-month departmental rotations.  Seprish understood that Ransom was selected based on his relationship with David Patchen ("Patchen") during Ransom's rotation in sales management.  Although women like Seprish were more qualified and had more experience, it was Ransom who was rumored to be a "rising star" in the firm.

46.  Seprish was paid less than similarly situated men and younger employees at the VP level performing similar functions and/or at the same level.  This remained true throughout Seprish's career, notwithstanding her extensive experience and qualifications.  Indeed, shortly before her termination (described below), Seprish understood that she was paid less than virtually every male in her salary grade (25).  Seprish believed that her salary was lower than permissible for the next lower salary grade (24).  Seprish also believed that she was the only VP being paid in the mid to high range of a Level 22, low to mid range of Level 23.  Further, Seprish suffered discrimination throughout the course of her career with respect to bonuses and, particularly, stock options.  Seprish repeatedly saw compensation, including bonuses, manipulated to the disadvantage of women and older workers, and personally lost compensation as a result of such manipulation.

---

[6] Despite the ever-increasing majority of female college graduates, Seprish believes that Raymond James interviews and hires predominantly males to participate in its "options candidate" program.

47.  Likewise, Seprish repeatedly saw the careers of younger male employees advance –
often into the highest ranks of management – but Seprish was repeatedly denied those
opportunities.

48.  Similarly, Seprish also was denied visibility within the company, particularly at
national conferences.  For example, at one of two national conferences, Seprish was provided
inferior accommodations than those of other VPs who had suite accommodations.  Additionally,
Seprish was charged for the meals of a guest when, she later learned, the company paid for
guests of male employees.  Men were not slighted in this fashion and, in fact, were assigned suite
accommodations.  These are just a few examples in which younger men were favored to the
disadvantage of Seprish and her female, older colleagues.

49.  Recognition within the company was also slanted towards men and younger
employees.  Unlike the male VPs on the management team who each attended all four regional
meetings, Seprish was not invited to attend most of these regional meetings.  Nor were Seprish's
efforts recognized in the same way as males' efforts.  Indeed, at one such meeting Seprish was
allowed to attend in New Orleans, Christian introduced the other three managers on his team and
Ransom, as well as his own wife (who was sitting next to Seprish), and asked them to stand, but
failed to acknowledge Seprish in a similar fashion.   Indeed, Seprish was the only member of
Christian's team not to be introduced.  When Seprish voiced her concerns regarding the
oversight, Christian admonished her.  This, too, is but one example of how Raymond James
slighted women and older workers in management.

50.  On Tuesday, March 21, 2006, Seprish learned that she was being terminated in
conjunction with an alleged reduction-in-force.  Seprish's job duties have been absorbed
predominately by younger, male employees.  Had she been a younger employee or a male,

Seprish believes Raymond James would not have made this decision, or at least would have made a substantial effort to find a place for her within the division or Raymond James.  Seprish, the second oldest individual and oldest female in the Sales and Supervision group, was the only person whose position was eliminated amidst the still continuing expansion of the ICD Sales and Supervision Department.

***Pahoua Lee***

51.  Lee, an Asian-American woman born in Laos, began her employment at Raymond James in approximately November 2000 as an administrative assistant in the Business Development department at Raymond James' St. Petersburg, Florida office.   In that capacity, she worked directly with recruiters Bill Counsman ("Counsman"), John Downes ("Downes"), and Patchen and contributed to their successes.  In July or August 2004, Lee advanced to the position of Business Development Associate.

52.  Most female managers and supervisors were in operational positions.  Upon information and belief, no female recruiter was hired until 2004 – nearly 30 years after Raymond James had been in business and Raymond James did not hire a female regional compliance officer until 2006.  From Lee's experiences, female employees who were direct, assertive or spoke their mind were labeled "difficult" based on gender stereotypes.  In contrast, men who exhibited those characteristics were promoted.

53.  Initially Lee performed the duties of a Business Development Specialist, but was compensated as an administrative assistant.  Later, her responsibilities were increased formally, but she still did not receive a corresponding raise or promotion.  Even after becoming a Business Development Specialist, Lee was not paid equally to similarly situated men.  For example, upon

information and belief, white males such as, Dana Thomas, Ron Taylor and Frank Armitage,

held the same position with similar duties, but were compensated more than Lee.

54. Additionally, like other women, Lee was denied opportunities for advancement and

increased earnings based on her gender and/or gender stereotypes. Suspicious of their under

compensation, Lee and other women complained to Raymond James about perceived

inequalities with compensation and how to achieve equal compensation. Thereafter, Raymond

James hired Frank Armitage as a Business Development Specialist at a salary higher than Lee's

or other women, despite the fact that Lee and other women were equally or more qualified for

the position. Lee and other women each went to McGovern individually to complain that they

were under compensated. To Lee's knowledge, Raymond James took no action in response to

their complaints. Instead, Lee continued to be under compensated throughout her employment at

Raymond James.

55. In addition to being denied equal employment opportunities, Lee was also forced to

endure sexually harassing behavior, including from her managers. For example, Scott Peisner,

VP of Operations, along with others of the firm, made references to Lee and other women as

being good looking and remarked that, as a woman, "you could not work for Business

Development unless you were good looking."

56. Before McGovern became Lee's supervisor, Lee complained to Counsman that she

felt uncomfortable reporting to him. Lee mentioned to Counsman that it was a well-known

within Raymond James that McGovern was a "womanizer" and that he gave Lee an "eerie"

feeling based on the way he undressed her with his eyes during a passing in the hall. Counsman,

however, did nothing. Lee's fears were confirmed once McGovern became her supervisor.

Specifically, McGovern repeatedly looked Lee up and down, as if he was undressing her with his

eyes.  He also inappropriately touched Lee's back repeatedly, forcing her to pull away or walk

away.  On one occasion, in the presence of other managers, McGovern put his hand on Lee's

hand, again forcing her to pull away.

57.  As another example, McGovern approached Lee and two female coworkers at the

office holiday party.  McGovern, again looking at Lee and her coworkers inappropriately, said

"you girls sure do clean up really well," or words to that effect.  That evening McGovern had a

"one night stand" with one of Lee's female coworkers, who remained employed despite her poor

performance.  During the months after the office party, McGovern routinely stared at the

coworker's breasts, as well as the breasts of other women in the office.

58.  Gender discrimination continued in Lee's office after McGovern left Lee's

management team.  Thereafter, William Van Law – a former Merrill Lynch manager rumored to

have had problems with assertive female subordinates – became Lee's manager.  Van Law's

stereotypical views of women were evident from the way he spoke to a woman as compared to a

man.  For example, in speaking to a woman, Van Law did not look at the woman or look her in

her eyes.  Van Law had no such problem interacting with men.

59.  Van Law terminated Lee on Oct. 16, 2006, after stating that she was "being difficult"

and "had a negative attitude" or words to that effect.  In response to a question about her final

paycheck, Van Law stated "you are a smart girl, you will be fine" or words to that effect.  Lee

believes that no male colleague was reprimanded, let alone terminated, for conducting

themselves in a manner consistent with Lee.

60.  Women were not the only victims of Raymond James' white-male dominated

culture.  Employees of other races or nationalities (like Lee) were almost non-existent.  As Lee

understands, only two Asians and a handful of African-Americans or Hispanics were employed

at RJFS in 2000.  To Lee's knowledge, minority employee representation has not increased

substantially since that time, and many departments had or have no minorities.  Likewise,

recruiting of financial advisors focused on white males.  To Lee's knowledge, Raymond James

did not establish a diversity committee until 2003.

   61.  Lee, an Asian-American, also suffered discrimination in Raymond James white-male

dominated culture as a result of dating and living with an African-American.  For example,

Raymond James' Vice President, John Downes, one of the individuals Complainant worked with

and for, routinely used race-based stereotypes in describing African-Americans.  In describing

events to other coworkers, Downes identified the race of an individual only if the individual was

African-American.  Downes also routinely described African-Americans and Hispanics as lazy.

Lee pleaded with her supervisor, McGovern, not to have to work with Downes because of the

remarks he made about African-Americans, but McGovern did nothing.  Lee also complained to

managers Counsman, Meyers and Sines, but no one took actions or referred Lee to Raymond

James' human resources department.  Consistent with the culture at Raymond James, Lee feared

retaliation if she went to the human resources department directly without her manager's

approval.

***Anne Robinson***

   62.  Robinson began her employment with Raymond James, on or about February 14,

2005 in St. Petersburg, Florida as an Executive Assistant 2.

   63.  During her employment with Raymond James, Robinson has been subjected to

unlawful gender, age and national origin discrimination.

   64.  Early in her career, she noticed that the predominantly male upper management team

was unaccustomed to their primarily female executive support staff taking an active role in their

development.  Indeed, Robinson expressed interest in bettering her career at Raymond James.

Although Robinson was experienced and well equipped to handle a variety of work, she was

given little responsibility and relegated to primarily remedial work.

65.   Roughly three months into her tenure, Robinson's direct supervisor, Richard Riess

("Riess"), began to belittle her work and publicly humiliate her with an outspoken and

unfounded opinion of her abilities.  Riess criticized her for performing functions that were part

of her job description, such as editing his correspondence for spelling and grammar errors, and

for writing notes on his personal calendar regarding his appointments.  Riess' displeasure in

being corrected resulted in animosity towards Robinson.

66.   In addition to publicly belittling her work, Riess began to verbally attack Robinson

on a personal level.  Riess taunted Robinson about her accent (she is a Scottish National), her

femininity, and her age.  For example, Riess once told Robinson that he hated his mother, but

would frequently refer to Robinson as "mom" in the presence of other executives.  Also, after

lunching at a Hooters restaurant with some other male executives, Riess returned and began

telling Robinson about the "big, buxom, Amazonian woman" who served them at the restaurant.

Riess then told Robinson that "she [the Hooter's waitress] could do your job.  You should switch

jobs, except you're too old."

67.   As Robinson's career progressed, Riess and other executives began to initiate tactics

to intimidate her.  In a conversation regarding a poem that Robinson had penned for her father

that was apparently emotional and touching to her father, Riess told Robinson "You won't make

me cry; I'll make *you* cry."  He also made statements in her presence such as "women are a pain

in the ass," and "it's my job to intimidate you."  Further, around this time, Riess informed

Robinson that he and the other executives had a "pool" on her.  Not being familiar the

colloquialism, she asked him what he meant.  He then criticized her and her nationality for not

knowing what "pool" meant in that context, and then told her, "We're making bets to see how

long you last because you're too sweet, and if you do last, we're betting how long it's going to

take to make you as miserable as all the others."  Riess did not act this way towards men in the

office and presumably, Robinson took this comment to mean that she was being targeted by

Riess because she was a woman, and so that she would be antagonized, belittled and miserable.

68.  Through no fault of her own, Robinson was informed that her job was in jeopardy.

As part of her job description, Robinson commonly opened Riess' mail.  One such piece of mail

was an inner office envelope from another manager named Cooper Abbott ("Abbott"), and it was

neither marked private, nor confidential.  Inside were a candidate's résumé and a note from

Abbott stating, "It's time to have the chat with Anne; either fish or cut bait."  The note also

invited Riess to review the enclosed résumé.  Robinson had, at no time prior to this point, been

given any indication that her work product was lacking or that she was not performing her job

functions to the necessary standard.  When she confronted both Riess and Abbott on the issue

independently, they each became angry and informed her that she had no right to open the

envelope.  To this day, Robinson does not know what lead up to these confrontations.  Robinson

learned of her apparent job issues by way of mistake, instead of through proper channels such as

the performance review process.

69.  In or about October 2005, Robinson accepted an unofficial transfer to work for

another senior manager named Richard Rossi ("Rossi") at Abbott's suggestion.  Like Riess,

Rossi was often hostile toward Robinson, and frequently humiliated her in front of the rest of the

staff.  Rossi also initiated uninvited physical contact with Robinson.  For example, Rossi would

come out of his office and, from behind, place both of his hands on Robinson's shoulders.  Not

only was this inappropriate, but Robinson never saw Rossi physically touch any of his male employees in a similar manner.  Further, Rossi would also frequently pepper his conversations with her with profanity and speak in a volume loud enough for all within earshot to hear.

70.   Around this same time, Robinson began working with some of Raymond James' wholesalers, who were primarily male, and who often made inappropriate gender-biased jokes in her presence.  For example, one wholesaler frequently referred to Condoleezza Rice as "Cunnilingus Rice."  Although Rossi was aware of these types of jokes and how uncomfortable they made women in the office feel, he did nothing about them.

71.   Although she found the environments hostile under Rossi and Riess, in or about December of 2005, Robinson requested a transfer back to Riess' department, as she had been informed upon her initial transfer that, were it her desire, she could transfer back to her previous position.  Upon her request, Riess told her "I told you that [Rossi] was worse than me," and he asked her to "give it some more time."  As her request to return working for Riess was denied, she consulted human resources to apply for another Executive Assistant 2 position that she noticed was open at Raymond James Financial, the parent company of Eagle Asset Management.  The assignment was to work for Chet Helck, the then-President of Raymond James Financial.  As a lateral move, Robinson was amply qualified for the position.  When asked why she was interested in another job, Robinson told human resources that her current work environment was toxic, abusive, and hostile.  It was not her intention, however, to file a report against her Rossi; she had only gone to human resources to apply for another job.

72.   Rather than simply process Robinson's application, human resources informed Riess that Robinson had reported a "hostile work environment."  Human resources did this without consulting Robinson and fully without her knowledge and consent.  Upon hearing this, Riess

spoke with Robinson and, rather then return her to her previous position as had previously been agreed, he offered her the opportunity to work for Abbott.

73.   It was also around this same time period that Robinson became the subject of retaliatory treatment.  In or about March of 2006, Robinson was, for no apparent reason, demoted to Support Specialist 3 when she accepted the position working for Abbott, but was not informed that accepting such position would require a demotion.  With this lesser position came both a demotion in title and in pay grade.  Thus, Robinson could no longer receive any substantial or significant merit increases, as her current salary was almost at top of her new pay grade.  Further, Robinson was told to report only to Abbott and both of the previous higher-ranking upper management figures were taken off her assignment.

74.   Robinson's working relationship with Abbott was scarcely better than her previous assignments.  Abbott also commonly belittled Robinson and her work product.   However, like Rossi and Riess, Abbott was friendly with men in the office.  Abbott would also give Robinson an unmanageable workload.  For example, there have been mornings in which she reported to work and Abbott had sent over 50 emails prior to her arrival containing issues and assignments. Although Robinson was more than capable of handling the bustling workload, Abbott went out of his way to ensure that she could not get all of the work done in a timely fashion and relished the thought of "catching" Robinson not completing all of her work assignments.  Although he often recognized the large workload he gave her, Abbott made statements to Robinson such as "you are not allowed to open your computer before 9:00 AM, and cannot open it again after 6:00 PM" and consequently, Robinson receiving a number of assignments without adequate time to complete them became commonplace.

75.  Abbott also began instituting measures to intimidate Robinson.  In addition to sending multiple emails prior to her arrival and berating her regarding her work, he has also left her voicemails prior to her morning arrival in which he didn't speak, but only allows the sound of typing on his keyboard to be heard.  Robinson does not understand why Abbott behaves in this fashion but knows that he does not engage in this sort of menacing conduct with male employees.

76.  During the time that Robinson began working for Abbott, human resources had meetings with all of the heads of institutional sales at Eagle Asset Management, from which they excluded Robinson, to discuss the circumstances of the "hostile work environment" that she had allegedly reported.  Although she was excluded, all of the involved male figures were present in these meetings, including both Riess and Rossi.

77.  Further, after she was transferred to work for Abbott, Robinson inquired as to the status of the lateral position working for Chet Helck for which she had applied.  Despite her capability and qualifications, she was never notified, contacted, or interviewed regarding her application.  However, she subsequently learned that a male had been awarded the position.

78.  The environment in which Robinson has had to work under Abbott, and throughout her tenure at Raymond James caused her great stress that began to physically manifest itself.  In or about June of 2006, Robinson began to experience debilitating headaches that, at one point, caused her to lose her vision for a period of about three days.

79.  Further, Robinson has been unfairly reviewed.  Robinson's latest annual review was due in September of 2006, but was not given to her until March of 2007.  Her performance should have been reviewed by all of the supervisors for whom she worked during this period, and not just Abbott, who was the latest supervisor at the time. However, the review was written

and signed only by Abbott, and the review was unfairly harsh.  She believes that she was being punished for the incident with human resources, and that the review was drafted in an effort to punish her and to keep her from being promoted back to Executive Assistant 2.  She did not report this unfair review to human resources based on her poor previous experience with that office.  Rather, Robinson felt that her only reprisal was to refuse to sign the review, which she did.

80.  In her relatively short career at Raymond James, Robinson has consistently been treated in an undeserving fashion.  Robinson's nationality, accent, gender and age have all been the subject of jokes around the office with the most senior of her supervisors participating or initiating the improper conduct.

*Andrea Duda*

81.  Duda began working with Raymond James as a broker in the Dearborn, Michigan office in January 1993.

82.  Throughout her tenure at Raymond James as a broker, Duda reported to male branch managers.  During this time period, Raymond James denied Duda the same career opportunities that were extended to male brokers.  For example, when a broker left Raymond James, the most desirable accounts were distributed to other male brokers, while Duda would only occasionally receive a small account with few assets.  Duda's receipt of small account distributions in comparison to her male colleagues had a direct affect on her production and compensation.  Like many financial services firms, production is the key factor in determining sales support, office selection, club recognition and business expense allowances.  Due to the discriminatory distribution of assets, Duda received less desirable sales assistants, offices, club recognitions and business expense allowances in comparison to her male colleagues.   In addition, Duda was

excluded from business-related gatherings and social events, and if she was invited to attend such meetings, such gatherings were typically male-oriented events. Duda is again a broker today and suffers the same discriminatory treatment as described above.

83. Duda was offered a management position in Ann Arbor, Michigan in 2000. However, from April 2000 to August 2000, she received no compensation for her managerial duties. In June 2000, the previous husband-wife managerial team, two brokers and the vast majority of the sales staff left the Ann Arbor office to join a competitor. Upon information and belief, this move was no surprise to Raymond James. In fact, Duda believes that the only reason she was given this office to manage was because the revenues would be low and the office was expected to underachieve. Duda does not believe that Raymond James would have put a male manager into this situation.

84. Unbeknownst to Duda at the time, taking over the Ann Arbor, Michigan branch was a losing proposition. With the departure of the previously mentioned employees, the Ann Arbor office saw a dramatic loss of revenue of nearly 60%. This was important because branch managers were paid annual bonuses based in part of the office's revenue from year to year. Although opportunities existed for Raymond James to assist Duda in growing the Ann Arbor branch's revenues, Raymond James refused to do so. For example, Duda saved Raymond James nearly $350,000 in the settlement of broker raiding claims that originated from activity prior to her arrival at the branch. However, when Duda asked if any of the money she saved would be applied to the branch's lost revenue, she was rebuffed and told that the money would go into a fund for "upfront payments" to new brokers. Upon information and belief, Raymond James did not treat male branch managers in this fashion and worked out many temporary arrangements to assist male branch managers in making a reasonable salary with bonus.

85.  It was not until December 2000 that Duda received a managerial salary of $1,500 per month, far less than what her male counterparts were making elsewhere in the company.  Indeed, although Duda focused far less on her own clients and increasingly more on her office's performance, this effort was conversely related to the money she made from the firm.

86.  In addition to unequal pay and work conditions, Duda was placed in an office where senior male brokers did not support their female manager.  For example, early on in 2000, Duda was told by a senior male broker that although she was the "boss," he was the leader of the office and everybody followed him.  Indeed, not only did he claim to run the office, this male broker also had the ear of Bill Roney ("Roney"), the district manager of Duda's region.

87.  Despite being told that she had no real authority in the office, Duda worked tirelessly to develop relationships with all the brokers in the branch.  Duda passed out business plans and offered suggestions on how brokers could better their businesses only to have her suggestions fall on the deaf ears of employees who favored taking direction from the senior male broker.  In addition to her own ideas, Duda urged employees to go to Raymond James' training sessions to expand their bases of knowledge and better their businesses.

88.  This senior male broker who claimed to be the "real boss" of the office fought Duda every step of the way.  After he had agreed to attend a training class at Raymond James' home office, he backed out at the last minute, and explained to Duda that he "just didn't feel like going."  Duda does not believe that a male manager would have been treated in this fashion.  Consistent with the pattern or practice of gender discrimination at Raymond James, Roney ultimately sided with the male broker.

89.  In addition to the local animosity toward women, Duda felt a general firm apathy to her gender.  For example, at the Women's Symposium, Dennis Zank ("Zank") told the women

who gathered that "the Women's Symposium could be viewed as reverse discrimination" and all but admitted that men at the firm resented the meetings.  On another occasion, Duda was speaking with another female employee who was part of the "Diversity Committee."  This individual told Duda that the "Diversity Committee" had requested information from the human resources department about the current breakdown of existing diversity within the firm.  Duda and the member of the "Diversity Committee" were both surprised to hear that human resources did not have that type of information.

90.  At a managers' meeting in October 2006, Duda approached Zank to thank him for allowing her to attend a coaching program through the Women's Network.  In explaining why Duda was not offered to attend other functions, Zank commented that he knew she was "tied up with those kids," referring to two children Duda and her husband adopted from Russia.  To Duda, Zank had implied that, because she now had a family, she was somehow unable to perform her job.

91.  In October 2006, Duda received her first performance evaluation in six years as a branch manager.  Duda believed that based on how she performed under the circumstances she was given, the evaluation was unfair and discriminatorily tailored to "document" her.  Duda refused to sign the document until changes were made to reflect her performance.  For example, the evaluation did not take into account that Duda greatly increased the profits in the office and that the office as a whole was performing significantly better than in the past.  When Duda explained what she was trying to accomplish with the branch office and her business plan for doing so, Roney commented that she shouldn't try to "change the things you can't."   Duda did not know what this meant.

92. In mid-November 2006, Duda was diagnosed with a lump in her breast. Duda had surgery the day before Thanksgiving and was out of the office for two weeks. Thereafter, Duda had to leave the office for chemotherapy and was on approved FMLA leave.

93. Duda had scarce communication with her regional managers during her leave. Indeed, nobody called her to see how she was doing. No flowers were sent. She received no cards. Duda knows that men who were out on leave often received well wishes, gifts and cards.

94. A short time after her recovery, her regional manager, Roney, called for a meeting with Duda on July 27, 2007. Duda thought there was something strange happening in the office because the senior male broker who had issues with her in the past was gathering employees in his office in a secretive manner.

95. At the meeting with Roney, Duda was told that Raymond James was "making a management change in Ann Arbor, Michigan, effective immediately." Roney went on to say that "it was no longer a good fit and that it may not have been a good fit from the beginning." Roney further stated that the change was not being made because of Duda's performance. Duda was subsequently demoted to a broker and a younger, less-experienced male manager was brought in to run the office.

96. The younger, less-experienced, male manager who succeeded Duda is well liked by the male brokers in the office who go out to bars and talk sports with him.

97. Duda agrees that it was not performance that cost her the branch manager job. Duda was demoted despite the fact that the Ann Arbor, Michigan office performed above expectations in fiscal years 2005-2007. Projected profits for the Ann Arbor, Michigan office in the fiscal year 2005-2006 was less than $100,000. However, Duda obtained over $230,000 in actual profits. Further, the projections for the 2006-2007 fiscal year forecasted profits of less

33

than $200,000. However, when the fiscal year closed in September of 2007, just over one month

after Duda was asked to relinquish her managerial position, the office's profits closed at over

$500,000.

98.  Duda believes she lost her job because a woman could not allowed to operate in a

male-dominated environment.  Indeed, only a few months ago, Duda was confronted by her new

manager who bragged about how he had taken care of a "situation."  Duda learned that the new

manager was excited that he had taken care of a situation that the current operations manager (a

woman) could not remedy.  He surmised that the person working with the operations manager

did not like dealing with women and made this very well known.  Duda told the branch manager

that this type of behavior was unacceptable, archaic and should not be tolerated.  In response, the

male branch manager simply turned around and left her office.

99.  Today, Duda is a broker with a book of business that pales in comparison to what she

could have had if she was not led down the prim rose path to a career in management that was

doomed from the start.

**Raymond James was Aware of the Conduct of its Employees
and Failed to Prevent Sexual Discrimination and Retaliation**

100.  Raymond James' management directed, encouraged and participated in the above-

described unlawful conduct.  Further, Raymond James allowed the discrimination and retaliation

to go unremedied for so long that it amounts to a policy or practice and constitutes Raymond

James' standard operating procedure.  Finally, Raymond James' Human Resources and Legal

Departments failed to take appropriate remedial action and, in effect, aided and abetted in the

unlawful conduct.

**The Discrimination and Retaliation Are Ongoing**

101.  Upon information and belief, the discrimination and retaliation described above are ongoing as a continuing violation of the civil rights laws.

102.  One such example of Raymond James' retaliatory measures came only two days after Plaintiffs initiated this lawsuit.   On September 28, 2007, Raymond James posted a class-wide communication on its intranet, RJ Net (herein after, the "RJ Net Memorandum" or "Memorandum").[7]  At least one Plaintiff (Robinson) believed that the Memorandum was sent by e-mail directly to Raymond James employees from Thomas James, the CEO of Raymond James.

103.  In the RJ Net Memorandum, Raymond James misrepresented the administrative history of this lawsuit and falsely suggested that the Equal Employment Opportunity Commission ("EEOC") would have dismissed the Charges of Discrimination that preceded this lawsuit.[8]  The Memorandum also incorrectly stated that Raymond James has already shown the allegations in this lawsuit to be "without merit."  Neither of these statements are true.

104.  Moreover, the RJ Net Memorandum instructed employees to forward any inquiries about this lawsuit to a company representative without comment and directs employees to inquire with Raymond James' own legal department if they have any questions or concerns about the lawsuit.

105.  The Memorandum was egregiously misleading in several fundamental respects.

---

[7] Plaintiffs have filed an EEOC Charge regarding this conduct and have requested a Right to Sue letter from the Agency.

[8] The wording of the RJ Net memorandum is confusing at best on this point.  A layperson who is unfamiliar with EEOC procedure may very well read the Memorandum as stating that the EEOC chose not to prosecute the claims and instead dismissed the Charges of Discrimination.

Contrary to the Memorandum, Raymond James did not shown this lawsuit or the underlying claims to be without merit.  Further, and again contrary to the Memorandum, the EEOC did not pass judgment on the underlying Charges in favor of Raymond James.  The Memorandum could be read to improperly suggest that the EEOC dismissed the underlying Charges after a final review on the merits.[9]  Likewise, and without any legal grounds, the Memorandum stated that Raymond James expected the lawsuit to be dismissed.  Raymond James' misstatements were improper, misleading and serve only to limit participation in this lawsuit.

106.   Even more troubling, Raymond James directed putative class members to contact Raymond James' Legal Department should they have any questions concerning the lawsuit.  To a Raymond James employee who understandably values her job, the Memorandum served as some type of quasi-guarantee that participation or interest in the lawsuit will be met with involvement from Raymond James' law department; a proposition that surely intimidated putative class members.  Indeed, at least one putative Class Representative (Robinson) feared immediate retaliation and believed she was running afoul of the company's instructions by contacting Class Counsel.  Upon information and belief, this sentiment is widely shared amongst Raymond James employees.

---

[9] To be sure, escalation of a dispute from the EEOC to federal court does not have any direct relation to the underlying merits of an EEOC Charge.  To suggest otherwise is simply improper.  Notably, the EEOC may dismiss a Charge and issue a Right to Sue at any point if, in the Agency's best judgment, further investigation will not establish a violation of the law.  That was not the case here.  To the contrary, Plaintiffs exercised their rights to request the authority to sue Raymond James after they determined that the EEOC was not likely to complete its

**Timely Representative Charges of Sexual Discrimination Were Filed**
**Against Raymond James with the Equal Employment Opportunity Commission**

107.  Timely representative charges of sexual discrimination and unlawful retaliation were filed against Raymond James with the EEOC.  The EEOC has issued Notices of Rights to Sue on the representative charges.[10]

**Plaintiffs Suffered Extreme Emotional Distress**

108.  By the acts and conduct described above, Raymond James intended to and did cause Plaintiffs severe emotional distress, or acted in reckless disregard that their actions had caused and would cause Plaintiffs such injury.

109.  The acts and conduct of Raymond James toward all Plaintiffs constitute extreme and outrageous conduct beyond the bounds of common decency.

**Plaintiffs Were Injured as a Consequence of Defendants' Unlawful Conduct**

110.  Plaintiffs lost wages and other benefits, suffered embarrassment and humiliation, and their careers were irreparably injured as a result of Raymond James' conduct.  Plaintiffs suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of Raymond James' conduct.

111.  The actions of Raymond James have caused and continue to cause Plaintiffs substantial losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

---

investigation within 180 days of the filing of the Charges.

[10] Robinson and Duda have filed additional representative Charges and have requested their Right to Sue letters which should be issued in the next few weeks.

112.  Raymond James acted or failed to act as herein alleged with malice or reckless indifference to the protected civil rights of Plaintiffs.  Plaintiffs are thus entitled to recover punitive damages in an amount to be determined by a jury.

## CLASS ALLEGATIONS

113.  Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of past and present female employees, including but not limited to, Business Development Associates, Business Development Specialists, Financial Advisors, Directors, Assistant Vice Presidents, Vice Presidents, Administrative Assistants and Managers of Raymond James in the United States who have been subjected to discrimination by Raymond James due to their gender and have been subjected to retaliation due to their opposition to discrimination.

114.  Plaintiffs are members of the class they seek to represent.  Plaintiffs Lee and Robinson bring this action on behalf of Business Development Advisors, Business Development Specialists, and Administrative Assistants who suffered discrimination on account of their gender.

115.  Plaintiffs Seprish and Beren bring this action on behalf of Assistant Vice Presidents, Vice Presidents, and managers who suffered discrimination on account of their gender and age.  Plaintiff Beren also brings this action on behalf of Business Development Administrators who were suffered discrimination on account of their gender.

116.  Plaintiff Duda brings this action on behalf of all Brokers and/or Financial Advisors who suffered discrimination on account of their gender and age.

117.  The class of female employees and former employees is so numerous that joinder of all members is impracticable.

118.   There are questions of law and fact common to the class, and those questions predominate over individual questions.

119.   The claims alleged by the plaintiffs are typical of the claims of the class.

120.   Plaintiffs will fairly and adequately represent and protect the interests of the class.

121.   The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

COUNT I

SEXUAL DISCRIMINATION IN VIOLATION OF TITLE VII

122.   Plaintiffs and all others similarly situated reallege the paragraphs preceding their causes of action and incorporate them by reference as Count I of this Complaint.

123.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

124.   Raymond James has allowed the discrimination alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes Raymond James' standard operating procedure.

125.   Accordingly, Plaintiffs, on behalf of herself and all others similarly situated, allege differential treatment and disparate impact theories of liability under Title VII.

126.   By its conduct described herein, Raymond James subjected Plaintiffs and all others similarly situated to sexual discrimination in violation of Title VII.

## COUNT II

## WAGE CLAIMS IN VIOLATION OF THE EQUAL PAY ACT

127.   Plaintiffs and all others similarly situated reallege the paragraphs preceding their causes of action and incorporate them by reference as Count II of this Complaint.

128.   The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Section 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.  Title VII also makes it unlawful to discriminate in the payment of wages on the basis of sex.

129.   Plaintiffs and all others similarly situated were paid lower wages than male employees in substantially equal jobs even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male employees.

130.   The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

131.   Raymond James intentionally paid Plaintiffs and all others similarly situated less than it paid male employees who were performing substantially equal work.

132.   By its conduct as alleged herein, Raymond James discriminated against Plaintiffs and all others similarly situated with respect to their wages in violation of the Equal Pay Act.

133.   Plaintiffs Soriano, Monti, Reeve and Patterson expressly opt-in to Count II of this lawsuit.[11]

---

[11] These individuals hereby expressly reserve the right to become class members for purposes of Title VII claims asserted herein in the event the class period is set which is inclusive of their respective specific allegations.

## COUNT III

### RETALIATION IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT

134.  Plaintiffs and all others similarly situated reallege the paragraphs preceding their causes of action and incorporate them by reference as Count III of this Complaint.

135.  Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.  In addition, the Equal Pay Act and Fair Labor Standards Act, 29 U.S.C. Section 215(a)(3), make it unlawful for any person to discharge or in any manner discriminate against any employee because she complained of wage discrimination.

136.  Plaintiffs complained of sex discrimination and unfair wage practices.

137.  Raymond James retaliated against Plaintiffs for their respective complaints in violation of the anti-retaliation provisions of Title VII and the Equal Pay Act.  By its conduct, Raymond James subjected Plaintiffs and all others similarly situated to unlawful retaliation in violation of Title VII and the Equal Pay Act.

138.  Plaintiffs Soriano, Monti, Reeve and Patterson expressly opt-in to Count III of this lawsuit.[12]

## COUNT IV

### (INDIVIDUAL CLAIM OF PLAINTIFF LEE)
### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e et seq.

139.  Plaintiff Lee realleges the paragraphs preceding her causes of action and incorporates them by reference as Count IV of this Complaint.

140.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race.

141.   Raymond James has allowed the discrimination alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes Raymond James' standard operating procedure.

142.   Accordingly, Plaintiff Lee alleges liability under Title VII.

143.   By its conduct described herein, Raymond James subjected Plaintiff Lee to racial discrimination in violation of Title VII.

<u>COUNT V</u>

(INDIVIDUAL CLAIM OF PLAINTIFF LEE)
RETALIATION IN VIOLATION OF TITLE VII

144.   Plaintiff Lee realleges the paragraphs preceding her causes of action and incorporates them by reference as Count V of this Complaint.

145.   Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

146.   Plaintiff Lee complained of racial discrimination.

147.   Raymond James retaliated against Plaintiff Lee for her respective complaints in violation of the anti-retaliation provisions of Title VII.  By its conduct, Raymond James subjected Plaintiffs and all others similarly situated to unlawful retaliation in violation of Title VII.

---

[12] These individuals hereby expressly reserve the right to become class members for purposes of Title VII claims asserted herein in the event the class period is set which is inclusive of their respective specific allegations.

<u>COUNT VI</u>

**(INDIVIDUAL CLAIMS OF SEPRISH, DUDA, ROBINSON AND BEREN)
AGE DISCRIMINATION IN VIOLATION OF THE ADEA**

148.  Plaintiffs Seprish, Duda, Robinson and Beren reallege the paragraphs preceding their causes of action and incorporate them by reference as Count VI of this Complaint.

149.  Raymond James has violated the ADEA by discriminating against Plaintiffs Seprish, Duda, Robinson and Beren because of their age in the terms and conditions of their employment, as described above.

150.  Raymond James willfully violated the ADEA by discriminating on the basis of age knowingly and/ or with reckless disregard of the law.

<u>COUNT VII</u>

**(INDIVIDUAL CLAIMS OF SEPRISH, DUDA, ROBINSON AND BEREN)
RETALIATION IN VIOLATION OF THE ADEA**

151.  Plaintiffs Seprish, Duda, Robinson and Beren reallege the paragraphs preceding their causes of action and incorporate them by reference as Count VII of this Complaint.

152.  The ADEA makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

153.  Plaintiffs Seprish, Duda, Robinson and Beren complained of age discrimination.

154.  Raymond James retaliated against Plaintiffs for their respective complaints in violation of the anti-retaliation provisions of the ADEA.  By its conduct, Raymond James subjected Plaintiffs and all others similarly situated to unlawful retaliation in violation of the ADEA.

<u>COUNT VIII</u>

(INDIVIDUAL CLAIMS OF DUDA)
VIOLATIONS OF ELLIOTT-LARSEN CIVIL RIGHTS ACT
SEXUAL DISCRIMINATION

155.  Plaintiff Duda realleges the paragraphs preceding her causes of action and incorporates them by reference as Count VIII of this Complaint.

156.  At all material times, Plaintiff Duda was an employee, and Raymond James was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

157.  Plaintiff Duda was discriminated against on the basis of sex by Raymond James, its agents and employees throughout the course of her employment.

158.  Plaintiff Duda's gender was at least one factor that made a difference in Raymond James' demotion of Duda from her position as a Branch Manager as well as the other adverse employment actions alleged in the Complaint *supra*.

159.  Had Plaintiff Duda been a male, she would not have been demoted or suffered the other adverse employment actions alleged in the Complaint *supra*.

160.  Raymond James, through its agents, representatives, and employees, was predisposed to discriminate on the basis of sex and acted in accordance with that predisposition. Raymond James, through its agents, representatives, and employees, treated Plaintiff Duda differently from similarly situated male employees in terms and conditions of employment, based on unlawful consideration of sex.

161.  Raymond James' actions were intentional in disregard for Plaintiff Duda's rights and sensibilities.

162.  The conduct of Raymond James, its agents and employees constitutes sexual discrimination in violation of MCL 37.2101 *et seq.*

163.  As a direct and proximate result of Raymond James' unlawful actions, Plaintiff Duda has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

COUNT IX

(INDIVIDUAL CLAIMS OF DUDA)<br>VIOLATIONS OF ELLIOTT-LARSEN CIVIL RIGHTS ACT<br>AGE DISCRIMIATION

164.  Plaintiff Duda realleges the paragraphs preceding her causes of action and incorporates them by reference as Count IX of this Complaint.

165.  At all material times, Plaintiff Duda was an employee, and Raymond James was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

166.  Plaintiff Duda's age was at least one factor that made a difference in Raymond James' demotion of Duda from her position as a Branch Manager as well as the other adverse employment actions alleged in the Complaint *supra*.

167.  Had Plaintiff Duda been a younger person, she would not have been demoted or suffered the other adverse employment actions alleged in the Complaint *supra*.

168.  Raymond James, through its agents, representatives, and employees, was predisposed to discriminate on the basis of age and acted in accordance with that predisposition.

169.   Raymond James, through its agents, representatives, and employees, treated Plaintiff Duda differently from similarly situated younger employees in terms and conditions of employment, based on unlawful consideration of age.

170.   Raymond James' actions were intentional in disregard for Plaintiff Duda's rights and sensibilities.

171.   The conduct of Raymond James, its agents and employees constitutes age discrimination in violation of MCL 37.2101 et seq.

172.   As a direct and proximate results of Raymond James' unlawful actions, Plaintiff Duda has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

COUNT X

(INDIVIDUAL CLAIMS OF DUDA)<br>VIOLATIONS OF ELLIOTT-LARSEN CIVIL RIGHTS ACT<br>RETALIATION

173.    Plaintiff Duda realleges the paragraphs preceding her causes of action and incorporates them by reference as Count X of this Complaint.

174.   Raymond James and its agents have retaliated against Plaintiff Duda for opposing violations of the Elliott-Larsen Civil Rights Act in violation of the Act.

175.   As a direct and proximate result of Raymond James' unlawful actions, plaintiff Duda has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliations and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life.

<u>COUNT XI</u>

(INDIVIDUAL CLAIM OF PLAINTIFF ROBINSON)
NATIONAL ORIGIN DISCRIMINATION  IN VIOLATION OF TITLE VII

176.  Plaintiff Robinson realleges the paragraphs preceding her causes of action and incorporates them by reference as Count XI of this Complaint.

177.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of national origin.

178.  Raymond James has allowed the discrimination alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes Raymond James' standard operating procedure.

179.  Accordingly, Plaintiff Robinson alleges liability under Title VII.

180.  By its conduct described herein, Raymond James subjected Plaintiff Lee to national origin discrimination in violation of Title VII.

<u>COUNT XII</u>

(INDIVIDUAL CLAIM OF PLAINTIFF ROBINSON)
RETALIATION IN VIOLATION OF TITLE VII

181.  Plaintiff Robinson realleges the paragraphs preceding her causes of action and incorporates them by reference as Count XII of this Complaint.

182.  Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

47

183.   Plaintiff Robinson complained of national origin discrimination.

184.   Raymond James retaliated against Plaintiff Robinson for her respective complaints in violation of the anti-retaliation provisions of Title VII.  By its conduct, Raymond James subjected Plaintiffs and all others similarly situated to unlawful retaliation in violation of Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all others similarly situated respectfully request that this Court find in their favor and against Defendants as follows:

### Class Relief

a.        Declare that this matter be maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the class identified above;

b.        Declare on behalf of Plaintiffs individually and all other similarly situated that the acts and conduct of Raymond James violate Title VII of the Civil Rights Act of 1964 and 1991 and the Equal Pay Act;

c.        Enter and appropriate injunction compelling defendant Raymond James to cease and desist from the wrongful practices here alleged and hereafter established;

d.        Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost as a result of Raymond James' unlawful conduct;

e.        Award Plaintiffs and all others similarly situated the present value of all compensation and benefits they will lose in the future as a result of Raymond James' unlawful conduct under Title VII and the Equal Pay Act;

f.        In the alternative to paragraph (e), reinstate Plaintiffs and all others similarly situated with appropriate promotions and seniority and otherwise make Plaintiffs and all others similarly situated whole;

g.        Award Plaintiffs and all others similarly situated compensatory damages under Title VII;

h.        Award Plaintiffs and all others similarly situated punitive damages under Title VII;

i.        Award Plaintiffs and all others similarly situated liquidated damages under the Equal Pay Act;

j.        Award Plaintiffs and all others similarly situated prejudgment interest;

k.        Award Plaintiffs and all others similarly situated reasonable attorneys' fees, costs and disbursements; and

l.        Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

### Individual Relief

m.        Plaintiffs incorporate by reference paragraphs (a) through (l) as paragraphs (a) through (l) of the prayer for relief for their individual claims;

n.        Declare that the acts and conduct of Raymond James violate the anti-retaliation provisions of Title VII and the Equal Pay Act provisions of the Fair Labor Standards Act;

o.        Award Plaintiffs the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

p.        In the alternative to paragraph (o), reinstate Plaintiffs with appropriate promotions and seniority and otherwise make Plaintiffs whole;

q.      Award Plaintiffs compensatory and punitive damages for retaliation under the Equal

Pay Act provisions of the Fair Labor Standards Act and Title VII;

r.      Awards Plaintiffs Beren, Duda, Robinson and Seprish liquidated damages pursuant to

the ADEA;

s.      Award Plaintiff Duda all damages allowed under the Elliot-Larsen Civil Rights Act;

t.      Award Plaintiffs prejudgment interest;

u.      Award Plaintiffs reasonable attorneys' fees, costs and disbursements; and

v.      Award Plaintiffs other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

185.  Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules

of Civil Procedure.


Respectfully submitted on behalf of Plaintiffs and those
similarly situated,

STOWELL & FRIEDMAN LTD.


By: **/s/ Linda D. Friedman**

Linda D. Friedman
Mary Stowell
STOWELL & FRIEDMAN LTD
321 S. Plymouth Court
Suite 1400
Chicago, Illinois  60604
(312) 431-0888

## CERTIFICATE OF SERVICE

I, Jennifer Schoen Gilbert, an attorney, hereby certify that on November 13, 2007, I caused a true and correct copy of Plaintiffs' *Amended Complaint* be served by filing with the Court using ECF upon:

Anne Marie Estevez
Morgan, Lewis & Bockius LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2339
aestevez@morganlewis.com
Fax:  305-415-3001
E-Fax: 877-432-9652

Michael R. Alford
Senior Vice President
Corporate Counsel
Raymond James Financial, Inc.
880 Carillon Parkway
St. Petersburg, FL 33716
michael.alford@raymondjames.com


                                                /s/ Jennifer Schoen Gilbert



Mary Stowell
Linda Friedman
Ethan G. Zelizer
Stowell & Friedman, Ltd.
321 S. Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888